Well, we're now on the matter of Rogers. This is the director of the Office of Workers' Compensation Programs. All right. Okay. Ready? Thank you. My name is Jay Friedheim, and I'm here on behalf of the petitioner, but actually I'm here on behalf of myself. It's an attorney's fees case, and we did not appeal the underlying issues. I'm going to ask to save a couple of minutes if I need to rebuttal. And the first thing I need to do is that I've learned this week, I should have learned long ago, so the invective argument is it's not properly before the Lord. And I'm sorry, particularly to my opposing counsel, this is how I've met him. Can you keep your voice up? Yeah, that's how I met Mr. Elisha. You know, in my religious tradition we have a concept called Lashon Hara. It means to wag the evil tongue. And inevitably harsh criticism of others always hurts the person making it more than the individual who has directed it. And I'm sorry. And it's, you know, carrying zealousness above and beyond. I think the Court of Appeals reviews benefit review board denials of attorney's fees for errors of law and substantial evidence. I get that out of Richardson. I think the critical difference between the settlement and that was an 8i settlement. I know that I'm not supposed to use initials, but that's section 908i. But an 8i settlement in this longshore business, it's got an interesting history. Before 1984, 8i settlements could not even contain medical. You couldn't settle the medicals unless the director in Washington signed off. So, you know, the difference between the settlement and the ALJ's disposition on remand is a real benefit to the claimant. And for that reason, I believe there was a successful prosecution of this claim. And in the Richardson case, it states, you know, there is very sparse law out there about what successful prosecution of a claim means. And it means in some of the case law in the Sixth Circuit, the 10th, that it's obtained additional compensation or other economic benefit. And I'm going to suggest to you that I think there are a lot of ways that you can find that I'm entitled to the attorney's fees that I worked hard to earn in this case. Let me ask, is it possible or probable in this case that he's going to go in for benefits based on this old injury at some point? Oh, yes, Your Honor. If you look, thank you for asking me that question because I hadn't figured out how I was going to get this in. Because the claimant settled this case for $3,000. And that's, okay, you know, just to be real clear, the $3,000 was paid when he put his name on the dotted line of the 8i settlement agreement. He had to come in. You know, this was after the supposed negotiation to get it up, $3,000, right? That was on 9-2701. If you look in the record on appeal at page 13, for the year 2001, that's up until September 27th, 01, they paid $11,971 in medical care for this guy. That year, in those nine months. And Dr. Jeffrey Lee, the only guy who was actually a surgeon in the cast of characters that was really out there, Dr. Jeffrey Lee said, this guy needs a CAT scan to figure out if there's a stenosis in there. They never got him the CAT scan. And the CAT scan is the kind of thing that would show if there's a way to go in there and do something about this. And I'd like to address something about that. You know, traumatic cervical injury, you know, it's notoriously disastrous, you know, notorious for coming back and disastrously showing itself again. After appearing to be just a mild annoyance for a long time, all those soft tissue cases, 10 years later, comes back, the guy's paralyzed from the neck down.  And that's why the medical benefits is more than just a medical lottery ticket. This is real. And now, we don't have any information on whether or not the carrier reestablished reserves after the settlement was rescinded. But, you know, I don't have any way to show you that. But when I got it back, I got him his medical care back. Now, it's very difficult to go out there and get things like CAT scans paid for and, you know, get the right thing. The guy has recently gone and asked to go back and see a doctor and was denied. Now, that's not before you. But the medical benefit is real. And the medical benefit is not subject to Section 22 modification. How do you address it? The board's attitude seems to have been, well, if there are in the future some of these benefits, then you can put in for fees. Yeah, well. That's what they kind of did. Well, I'd like to address a few of the things that the board got really wrong, okay, about the three. Let me just stay focused on this. How do I address it later? Well, I got him real benefits now. That's how I saw it. I'd say that, you know, that it's really now. You know, to argue my opponent's case, you know, on first blush you might say he's got not one more penny in his pocket because of this settlement since it was vacated. And he's not worked one more day on the job. That's how I see the doors since I vacated the settlement. That he's not had any more medical service paid for. But if we go back to the not one penny more, I got him back his job. He is getting temporary disability insurance payments, long-term temporary disability insurance because he's on the employment rolls back at work. And if you look at the record on appeal on page 31, if the judge originally relied on the fact, well, we'll let this thing go through because he's going to get $890 every two weeks, which he's still getting today. But it's going to run out. It doesn't go on forever. So that is real dollars. But on top of that, and what I've argued all along is the three grand for guys. And that's where I believe that the Benefits Review Board got it wrong. And they just simply got it wrong in the opinion. It says on page 91, claimant of beers, the $3,000 was an advance. There's nowhere in the record that I agreed it was an advance on future comp. We went into that second trial asking for $2,900 or some amount like that as temporary disability that our client was owed. He was asking for, meaning the employer, was asking for the $3,000 back or apply it as a credit. We're in the back room in the chambers with the ALJ. And he says, well, you know, if we take this out of the trial, look, he's asking for the $3,000 back. How are you going to get it back from him anyway? You know, he's asking, I'm asking for $2,900. Let him keep the $2,900, or let him keep the $3,000, and then we'll try the issue on the medical care. That's what happened. That's why I'm not up there objecting to all these findings. And then if you look at the ALJ's order, it says, you know, the amount of benefits paid to him was, you know, $52,744. And that's in the stipulations part. And if you look, that's for exact, that was what they were saying at the beginning. That's how much he'd received before we got the three grand. And at the end it says, the amount of comp can be applied, you know, that's been paid, can be applied to what's owed. Well, do the math. Where's the $3,000? My client got that $3,000. And, you know, the Benefits Review Board invented the idea that it's a credit out of whole cloth. And that's where they go over the line on attorney's fees, you know, for errors of law and substantial evidence. There is substantial evidence in the record that I'm asking for $2,900 back in. And there is substantial, you know, and that's for past monies owed. I'm not asking for a future. There is substantial evidence in the record that the employer waived his right to a credit. It says it on page 92. If you look at the opinion, I'm just a little excited. I've been gearing up for this. In the opinion at the top of the page, it says the employer waives his right to a credit. And then at the bottom of the page, it says, well, no, he's asking for the, you know, you're going to give it to him as a. At the top of the page, it says the employer is giving the. I need to get this exact. Shouldn't be from. Okay. Where it says that the advance isn't on the bottom of page two of the opinion, it's page 91 of it. You go to the next page and it says, you know, the employer contends that to facilitate the proceedings, the administrative law judge asked the employer in chambers to waive its right to seek a credit for overpayment. And then at the bottom, it says that the at a minimum in the bottom of the page on 92 at a minimum, employer is entitled to a credit for $3000. Well, how did he waive it and let us keep the money? And then the benefits review board come up with the idea. Well, in fact, it's a credit. And we got him that money. That's comp that he never got before. That's the hall and tunnel that you can drive my attorney's fees through. Well, the problem with the 3000 might be that he had that under the settlement, too. Oh, but respectfully, Your Honor, the settlement puts $1000 for future medicals, but it's silent on towards how much he's paying to give up his job, which I am arguing to you that more important than my attorney's fees, and I know I should be. We have a chance to do something here. As Mr. Alicia says, we routinely put in that the guy has to quit his job. Well, it's more than that. When you read in the settlement agreement, he has to never go back and ask for his job again. And they're routinely putting it. That's ultra-various. That's not in the act. In fact, Section 48A says you can't fire a guy because he made a claim. Well, I'm saying you can't make him give up his job as part of a settlement and have it stamped by an administrative law judge and then found to be raised judicata and collaterally estopped from asserting from the fact that I didn't know I gave up my job in another court of law. These guys at the Department of Labor don't have the right to do that. Well, then what you're – I mean, I can understand you're saying that, all right, the right to return to work is an economic benefit, but the 3000 is not anything different from what he had under the settlement. What he gained by having the settlement removed is the potential right to return to work and – Every – And the potential of future medical payments. Okay. Well, the potential future medical is a big deal, and I don't know that I should have to wait around until my guy has – you know, after what I've done for him, I'm supposed to wait around until he comes back and we can figure out how to get him to a doctor and another administrative law judge trial. Every two weeks he gets $890 from long-term temporary disability insurance that's mandated on employers in the state of Hawaii, and if he was off the employer's rolls, they wouldn't even be allowed to pay him that money. And they went in with a song and dance about how he's going to get this money indefinitely, and I realize I overreacted because it isn't indefinitely. It's only for a period of five years, but the judge originally relied on that it was indefinitely. And, you know, I went in there before I ever showed up in front of this judge and how I got the case in the first place. You know, I had a 14-trial set, and, you know, there's an unrepresented guy, we should do him a favor, which is not before the court right now, how I got into it. I got into it, and that's who I am, and I'm glad I did it. But when I read this thing, I submitted in my pretrial statement, nor at all, right, we want out. It should have been off. I mean, the judge could have walked in there and said it's over, but he didn't. He turned it into an evidentiary hearing and started demanding that I go out, that I get a medical care, that I go out there and figure out how to pay for this stuff so I could come back and prove to him that the settlement is not adequate. I was never arguing the settlement wasn't adequate. I'm saying you don't want this settlement. The $3,000 was out there. They were asking for the money back. At the end of the day, they not only waived their right to the credit. The Benefits Review Board just got it wrong. There is no credit out there. And the ALJ does not address anywhere in his decision that $3,000. Come back. Okay. Thank you. Yes, thank you, Your Honor. May it please the Court. My name is James Leach. I'm the attorney for Hawaii Stevens Inc. and Signal Mutual Indemnity Association. You look a little bit like Jerry Brown. Is that good? Thank you, Your Honor. You would say the same thing. I had told him he looked like you. You look good. I mean, you've got the white sideburns. It's a lot of stress, a lot of hard work. Your Honor, at the outset of my argument, first and foremost, I want to apologize to Mr. Friedheim and to this Court. An associate in my law firm drafted the appellate brief. There was a mistake in the brief, and it's an honest, good-faith mistake. And as I am before you today, I have been in trial the whole week in San Diego, California. Initially, I filed a petition to continue this hearing. It was denied. I tried to continue my trial. It was denied. And the judge graciously, we didn't complete the trial. She graciously allowed me to leave at 1.30 San Diego to catch a flight in L.A. to catch this oral argument here. In preparation for the oral argument this morning, I read for the first time Mr. Friedheim's reply brief. The associate in my law firm who drafted the initial brief on behalf of Hawaii Stevedores and Signal Mutual Indemnity Association made an honest, good-faith mistake, and that mistake related to the payment of the $3,000. In all Longshore Act claims, the substantial majority of the time, and I've been doing Longshore work for 16 years, and the substantial majority of the time is there's a decision in order issued. It's filed and served by the district director. Thereafter, an employer has 10 days to pay to avoid a Section 14-F penalty. In this particular case, Mr. Rogers was represented by Stephen Birnbaum, a highly skilled Longshore Act attorney. And Mr. Birnbaum, as the case was coming up for trial, elected to substitute out as the attorney of record. Mr. Rogers was looking for other attorneys to represent him. And eventually, we offered a settlement because the case was coming up for trial. We offered a $1,500 settlement. Oh, I'm sorry, Your Honor. We offered a $1,500 settlement to resolve the case because it was coming up for trial and we knew he was improper. We heard nothing. I eventually received a phone call from Mr. Rogers. Mr. Rogers said, I would like to settle the case, but I want to settle it for $3,000. In other words, he wanted to increase the ante from $1,500 to $3,000. What he said was, I want to do this settlement. Can you draft and get me the documents immediately so I can get paid? I explained to him that you have to go through a process. I have to draft settlement documents and we have to get them approved by the administrative law judge. He asked, how long will that take? I said, it takes 30 days. If it's not approved within 30 days by operation of law, it's deemed approved. So he said, I need it. I had a family emergency. My father died. I need the $3,000. If I sign the settlement documents, would you release the $3,000 check? It's not a lot of money. He could renege on the agreement. We went through with the deal. We gave him the $3,000. The point that I'm just making here at the outset is, in the brief filed on behalf of Hawaii, Stephen Erzank and Signal Mutual Indemnity Association, there was an honest mistake. The money was not paid subsequent to the decision and order. As Jeannie Kuo, the attorney in my law firm who wrote the brief, it was actually paid when he did settle the case. It's not material. There is no dishonesty to the court. I'm sorry that I only saw it this morning. If the court feels a sanction is appropriate, a monetary sanction, I will be happy to accept the monetary sanction. There will be no further. Your Honor, you know what? I'm professionally embarrassed that there was that oversight. I talked to my clients about it just before. I said, well, I've got some good news and some bad news. The good news is I've reviewed the evidence and I'm ready to go for the oral argument. The bad news is there's a mistake in our brief, and I do want to apologize to Mr. Friedheim. Your Honor, I don't think it's material, but just the duty of candor to the court. There is no intention to mislead, and I apologize. And I apologized to Mr. Friedheim before we did the oral argument. And if I could use the remainder of my time to please address my argument. But if the court deems a sanction is appropriate, I will accept the sanction. Well, thank you very much, and I'm most appreciative. Thank you. Your Honor, with respect to this case, what is interesting is this. Thomas Rogers had an injury. My clients advanced him all the indemnity payments. When Mr. Friedheim was just up here before you, I think he made a good faith mistake. And that good faith mistake is this. What happened was, with respect to his Longshore Act claim, he received temporary total disability benefits. My client voluntarily advanced all of those indemnity payments, and those indemnity payments equated to $52,724. In addition to that, we paid the $3,000, which was the terms of settlement. So it's actually $55,724. It's nowhere anywhere in the record that that's the actual monetary amount, not what Judge Avery ordered. He was the second ALJ in this case. What he ordered was all the indemnity payments that were voluntarily paid, all of the medical payments that were voluntarily paid. He found his condition was permanent and stationary, and he found he needed no further medical care and treatment. There were no other benefits obtained by Mr. Friedheim. The problem in the incident litigation is this. Mr. Friedheim is coming to this court, and he's asking for attorney fees and costs, and his argument is, I have successfully prosecuted the claim. In reality, he has not successfully prosecuted the claim, and as the Benefits Review Board argued, or at least noted in their order, what he obtained was nothing more than a tactical victory. And in this particular case. The fact that apparently in the settlement agreement, he was never to work as a stevedore again. Your Honor, I'm happy to address that. I think I can address that. And I didn't mean to cut you off. Okay. So, it seems to me that apparently some benefit came from voiding the settlement. Your Honor, and that's a good question. There's a lot more to this case than really meets what you see in the record, and here's the story that goes behind that. Thomas Rogers alleged an injury to his cervical spine, and with respect to the cervical spine injury, my client advanced all the indemnity benefits and furnished medical benefits. He also was suffering from a non-industrial condition, a neurological disorder known as spastic paraparesis, and essentially he had a dead foot. So when he walked, he would drag his foot. In the longshore environment, he's around a lot of moving equipment, and there were dangers associated with the progression of his neurological disorder. All of the doctors in this case opined that he should not return to work, to include his treating doctor, Dr. Stuart Pang, who's the neurologist who's rendering treatment to him for the spastic paraparesis condition. What you're not hearing in this case is what was going on at the time of the settlement. Everybody knew that Thomas Rogers, for all intents and purposes, could not remain gainfully employed as a longshoreman. He had this non-industrial neurological condition. There was no evidence whatsoever that the employment aggravated, worsened, or accelerated that condition. It's a non-issue. What Hawaii Stevedores was doing was once the indemnity payments terminated, they were segueing him into sick leave benefits, and the sick leave benefits are a prerequisite to get the long-term disability benefits, and those long-term disability benefits, I believe, would pay him at $8.90 biweekly. So in this particular instance, please bear in mind, his comp rate was $8.91 per week. Are you saying to me that if the settlement was in place, he would still get this disability? Yes, that was already going on. And what you see in Mr. Friedheim's brief and arguments, what was happening is Stephen Birnbaum was the attorney. I took the deposition of Dr. Terry Vernoy. His testimony was his testimony. Thereafter, there was a major procedural hurdle for both Thomas Rogers and for Hawaii Stevedores to put him on the long-term disability. The procedural hurdle was we wanted to get his doctor, and he was now unrepresented. We wanted to get his doctor to write a report that just said he could no longer work, so we can put that in for the processing of his long-term disability benefits. Logic would dictate, and I asked my doctors, Dr. Kenneth Nakano, a board-certified neurologist, and Dr. John Henrickson, a board-certified neurosurgeon, I asked them, would you please author a report that just says he can't work in this employment field so we can process the long-term disability, and they both said we're not as treating doctors and we don't want to do that. So we went to Dr. Terry Vernoy, and Dr. Vernoy filled out some paperwork to help that process going. As I'm here before you today, based on information and belief, and I don't know if he's still receiving the long-term disability benefits, but I believe he is, but I'm not certain. Hawaii Stevedores was doing all of these other things for Thomas Rogers. Thomas Rogers cannot work as a longshoreman anymore, and it has nothing to do with the work-related injury. Mr. Friedheim, in his opening, made a statement to this court, and essentially what he said was this employer, Hawaii Stevedores, maybe he means this attorney, Jim Alicia, that we routinely put a clause in settlement documents that say that the claimant voluntarily resigns from their employee. Now, I have done that, but I have done that in cases where my clients are given a considerable amount of money and everyone knows because the plaintiff's contention, or in this instance, the claimant's contention is I'm permanently and totally disabled. I can no longer work. Well, the other side of that coin is my clients or other maritime employers don't want to give someone $300,000. Once they get that payday, they show back up at work, and you're right back on the risk again. And under the Longshore Act, if you aggravate it 1%, you buy the whole resulting condition. You take your plaintiff as you find them. So there are certain instances where I have used that clause, but there was this instance because we knew we were putting them on long-term disability, and it made perfect sense to put that clause in there. So I hope I answered your question. If I was evasive, I apologize. Well, the question, of course, is whether your opponent said that if the settlement had continued, he wouldn't be getting these payments every two weeks, and because we got him still eligible to be employed, he is getting these payments. That's actually a mistake, Your Honor. It's completely wrong, and it's erroneous. The bottom line is if he's capable of going back to work, then he wouldn't be getting those benefits. But for the efforts of Hawaii Stevedores to get him on this long-term disability, the sick leave benefits, long-term disability, when the temporary total disability benefits were terminated, my clients took great lengths to do everything that was humanly possible to start to get him another revenue stream to keep the money coming in. And unfortunately, I'm not so certain when you look at all of the briefing and all of the arguments that that's understood. But what we do know is this. We did a settlement. Yes, Mr. Rogers was in pro per, and it didn't matter to me if the case went to trial or if it settled. When we reached the settlement, yes, he did receive the $3,000 when he signed that check because he said his father died, and then thereafter, I think his father died a couple of other times in the course of the litigation. So the veracity of that statement, I think it's called into question. But when we submitted the settlement documents to Judge Turek, he did the right thing. The first thing he said was an unrepresented plaintiff, claimant, and it's $3,000, and he's settling compensation benefits. He's settling future medical benefits, and there's even a clause here that says he's going to voluntarily resign from their employee. So he said, I'm setting this strictly for a hearing on adequacy. I want to make sure, and it's in the excerpt of records submitted by the petitioner. He said, I want to have a hearing on adequacy to make sure he understood the terms of settlement, that it wasn't procured by duress, and it was adequate. You know, on its face, $3,000 doesn't look adequate.  His condition wasn't permanent and stationary in 2001. It was permanent and stationary back in 2000, and we didn't ask for reimbursement under Section 14J. What we asked for was a credit. We just said, we think we overpaid you $30,000, and I'm just giving you an approximation. I took the position that there was an overpayment of indemnity benefits because my expert said, when we did these tests, we now realized he was fading his complaints for economic gain, and that was essentially their testimony, and after that testimony came out, that's when we then said, oh, then we paid him a year's worth in indemnity payments, and he really reached MMI a long time ago. So I had an argument in there that there's an overpayment. Stephen Birnbaum substituted out for a reason. No other lawyer wouldn't take this case for a reason. Unfortunately. This is extra records. Oh, okay. I'm sorry. So, but in any event, with respect to this case, Your Honor, the $3,000 was adequate. Judge Turek, after having a hearing, found it was adequate. But what is interesting, when we did that hearing, Mr. Friedheim asked to have Mr. Rogers testify, and he said, and the long and the short of it was, Mr. Friedheim asked for an opportunity to submit medical evidence to enhance the disability or to show to the disability that Mr. Rogers needed more treatment. Judge Turek graciously gave him a period of time to submit medical evidence indicating that his condition needed more treatment. The time period lapsed. I filed a motion. Mr. Friedheim then asked for an extension. Judge Turek gave him an extension. No new evidence came in, and then the judge said, I'm going to issue this order and approve the settlement. The withdrawal of the settlement was really argued on appeal to the Benefits Review Board. Now, could an argument be made that when Mr. Friedheim and Thomas Rogers showed up at the adequacy hearing, that maybe that was constructive notice of an attempted withdrawal of the settlement? But it certainly wasn't articulated that way. But the case ultimately went to the Benefits Review Board. The Benefits Review Board looked at the Fifth Circuit's holding in Oceanic, Nordahl, and they had essentially said, look, an employer cannot withdraw from the settlement prior to issuance of an order, but it's a case of first impression. A claimant cannot. That's what came out of the Thomas Rogers case. They said, look, the claimant wanted a withdrawal. We'll construe it that he wanted a withdrawal. We'll let him withdraw it and pursue the claim. Jay immediately, Mr. Friedheim, I apologize, filed a petition for attorney's fees saying, I successfully prosecuted the claim. The Benefits Review Board said, no, you didn't. You just basically have ongoing litigation, and when the ongoing litigation is resolved, we can address whether or not there was a successful prosecution of the claim. When the case was remanded to another administrative law judge, Judge Avery, in chambers, Judge Avery said, can we streamline some of these issues? Look, you overpaid. You got $3,000 that you're asking for a credit. Let him keep it. We said, fine, keep it. We did the trial. After hearing all of the evidence, and doctors testified in the case, after hearing the evidence, he found no further benefits were due in owing, and under 33 U.S.C. section 928A, which is the controlling authority for attorney fees, a claimant's attorney must successfully prosecute the claim. A successful prosecution of the claim has got to obtain two things. He must obtain additional benefits above and beyond those which were previously paid. In this instance, he did not. All of those benefits were previously paid. An argument could be made that there was that $3,000, but that was a windfall to the claimant. Another instance, he would have to show liability, that is if an employer denied liability and that wasn't applicable in this case. So the bottom line is, yes, we've had all these different stages of litigation. Most definitely, Mr. Friedheim did legal work, but at the end of the day, he obtained no extra benefits above and beyond those which were voluntarily paid. Well, let me ask this. Has there been a material change in the relationship with the parties? None at all. Mr. Rogers, it's my understanding, as I'm here, I believe he's still receiving long-term disability benefits. Whenever that ends, he, I believe, goes on to retirement benefits. Now, but I don't really know the answer to that question. No? I mean, he's no longer employed with my client. I mean, he doesn't work for Hawaii Steve Does if that was part of your question. Under the settlement, he couldn't have ever claimed for any future medical benefits. Is that right? Your Honor, if the settlement went forward, then he foreclosed any claim for future indemnity payments or future medical payments, but that issue was then subsequently addressed by Judge Avery, who found no further benefits are due to include no further medical. But then, before the benefits were paid, I don't understand. No, no further benefits were paid, Your Honor. I thought we heard that they paid something like another $11,900. No, no. That was what Mr. Freheim was saying, Your Honor, was when you looked at the 8i settlement application, that's in Petitioner's Excerpt of Records, when you look at page, and I've got the page right here, but when you look at the settlement application. What you're saying is that from the time that you got this ruling from the Benefits Review Court that no money has been paid to Mr. Rogers? Correct. No money has been paid on any medical care. Correct. Not a dime. Correct. And he's been getting these disability payments. He got sick leave payments and he got long-term disability. He would have gotten them anyway. He was already getting those previously. I don't think you've quite answered my question. I'm sorry. Which was, in future, if he has some problems from the injury that he suffered, and he wants medical payments, he can apply for those, and he couldn't have if the settlement had gone through. Is that correct? Well, Your Honor, yes and no for this reason. Judge Avery, and I have five seconds, but Judge Avery found he needs no further medical treatment, and that's in his decision and order. Yes, but that would not foreclose his having future problems connected to this injury. Is that right? That would entitle him to medical? Your Honor, I think once Judge Avery issued that order and Mr. Friedheim did not do a reconsideration of that order, nor did he file an appeal to the Benefits Review Board of that order, that's a final order, and the claimant is not entitled to any further medical treatment. Well, I don't quite understand the statement that there could be attorney's fees if he later required good ANCOT benefits upon application. Your Honor, and I think to answer that question, what the board was saying to Mr. Friedheim was, really what you achieved here is nothing more than a tactical victory. The extent and the success of your victory is going to have to be determined at a later date. In other words, now when we have the trial in front of Judge Avery, we did the trial in front of Judge Avery and he said no further benefits. But now he can get future medical treatment, right? No. Judge Avery issued an order that said he reached permanent stationary status and he requires no future medical care and treatment and he needs no future medical care and treatment. So what benefits were there with withdrawing the settlement? There were no benefits. There was none. There was none. And that's the reason why the ALJ said no to the attorney fees. There were no benefits obtained. Even the Benefits Review Board said there was no successful prosecution. In order to get the fees, you need a successful prosecution, and there was no successful prosecution. I thought that settlement was set aside so that if in the future he incurred medical expenses arising out of his injury, you know, these injuries you find today and go on for years and boom, something happens as a result of that injury and you need medical care. He can't get that medical care. No. And, Your Honor, you're absolutely correct. Your line of reasoning is perfectly correct. That's exactly what the Benefits Review Board said, but this is what they said. You've got what we now have to see what the ALJ says on remand. We did that trial in front of C. Richard Avery, the administrative law judge. After hearing all the evidence, he said no more compensation payments, no more medical benefits. You've reached maximum medical improvement and you need no further medical treatment. Now, the Benefits Review Board decision after the remand, June 28, 2004, last paragraph, says the administrative law judge found the claimant is no longer disabled and is not in need of any further medical treatment. Thus, claimant's right to additional disability benefits is employed and is subject to the time constraints of Section 22 and Section 14J credit. Claimant's right to additional medical benefits is subject to his establishing the necessity of additional care for his work injuries. Should claimant obtain an economic benefit in excess of the $3,000 credit and or additional medical benefits, he may refile his fee petition for work performed before the board for successfully overturning the settlement agreement. That sure sounds like there's a potential for additional medical payments someday, maybe. Well, Your Honor, in addressing that, the bottom line is even as we're here today, there's been no evidence, no new evidence whatsoever saying there's any entitlement to any further benefits above and beyond those which were previously paid. And the provision that you read from the Benefits Review Board's order, as you were reading it, I tried to find where you were reading it. It's the last paragraph. The last paragraph? Well, it's the second to last. There's one sentence paragraph after it. It's on page 92 of the excerpt of records. Well, it looks like 0005 is stamped on this. But see, and here's part of the problem, Your Honor, from a procedural standpoint. Once Judge Avery issued his order, logic would have dictated if Mr. Friedheim had a real problem with the decision order, maybe he should have reconned it within 10 days to clarify, are you foreclosing future medical care and treatment, which he didn't do. I mean, in the nine fees, the board seems to have foreclosed. But he didn't do that, and nor was there an appeal to the BRB on the ALJ within the 30 days. The only thing that happened to the BRB was now the request for the returning fees. And that's the issue that's before you. Can I ask you a question? What's the request for returning fees? How much money do you have? I believe Mr. Friedheim is looking for approximately $16,000 in fees at the BRB level, plus costs, plus fees at the ALJ first level with Judge Turek, plus attorney fees with Judge Richard Avery. So I believe there's three sets of attorney's fees that he's seeking reimbursement for. And the total value of the attorney fees, if I could just defer to him, I'm sure he's had a chance to, Mr. Friedheim's had a chance to add that up. Your Honor, we're here asking for attorney's fees for the Benefits Review Board case. What? We're here asking for attorney's fees for the Benefits Review Board case. It's approximately $16,000. I have applied to Los Angeles to argue the Benefits Review Board case. There's about a thousand costs. And I don't have an answer for how much was put in total in. But it's not waiting before us. And I'm not trying to skirt the issue. I can give you a letter supplementing this with those fee apps. But the way it works is you've got to put the fee apps in in a period of time. I did put in for work done before Judge Turek, which is the ALJ 1, because that's what got me up to the Benefits Review Board. It was our position that when we said Nordahl in our pre-hearing statement, we should have walked into the room and they say, oh, yeah, he wants out, it's over. If you look in the pre-hearing statement, which starts on page 19. Nordahl is mentioned in page 22. Counsel, you'll have your turn to reply. All we asked for was what the dollar amount was. And I can supplement because I don't have it in front of me. Yes, Your Honor, I'm sorry that I didn't know that. I knew there were three fee petitions. I knew, though, the only one that was before this Court was the fees for legal work done at the Benefits Review Board level. Your Honor, what you're really saying is that all the work that Mr. Preet and I did was totally unnecessary and it would have all happened anyway. Truthfully, really what happened was we had protracted litigation that was very much unnecessary and it changed nothing as to what originally happened when the parties signed off on that settlement. I think what's most important and, in my mind, very compelling, is that two administrative law judges have had an opportunity to hear testimony and both found that the $3,000 settlement was reasonable on the one hand and then the other administrative law judge on remand from the higher court found he's entitled to no further benefits. So there has been no successful prosecution of the claim and therefore he has not satisfied the requirements of 33 U.S.C. section 928A or 20 CFR section 702.143, 134A, I'm sorry. So we believe he just hasn't satisfied any of the requirements and he's obtained no benefits whatsoever. As the BRB said, it was a tactical victory and nothing more. Could I keep arguing or should I? Because I know my time keeps getting added. We are here, as a matter of fact, in time. You now owe us almost $10,000. Why don't you just give him the money and he can all go? I understand. Okay, here I am. That's it. Okay, thank you. And again, please accept my apology for the mistake in the brief. Okay, you keep investing so long, I really don't think you're guilty. Thank you. I guess I'm here to invite exactly to show you what this is about. The TDI is an employment-related benefit. My client is still on their rolls even though he's not working for them. When it says that I asked the trial judge to go out there Would he have gotten a TDI anyway without you? I do not believe so, Your Honor. My understanding is that TDI is a state-mandated benefit in the state of Hawaii. Okay. As a result of your employment relationship. So he would have gotten it anyway. No, that's when you get the job and when you're working for the company. Now, does it go on afterwards? I don't have the answer to that. My understanding is Well, they tell us it goes on. But I'm saying that, Your Honor, there's nothing in the record to support that, and that, in fact, that part of the employment rights that he got from his employment Okay. Now, in the record somewhere, though I don't have it in the record on appeal because I didn't know, is the transcript of the first hearing with the administrative law judge. I would hope that one of your clerks would go through that. I wasn't asking for anything from, you know, more I did ask when he said, well, you have to go out and get more evidence, which I thought it wasn't an evidentiary thing. It was just to find out whether or not the guy wanted to withdraw from the settlement. Also, when he says that, you know, that it would have become if the settlement agreement was submitted within 30 days, it becomes approved whether or not they approve it. That's not true for an unrepresented person. This settlement agreement was entered into by an unrepresented person. It has to have an ALJ look it over or somebody look, you know, they have to scrutinize it. The one question that I want to have you answer again for me is whether if the settlement had held, he would have gotten no further opportunity to get medical benefits for future problems. Now, does he have the opportunity if something happens that relates to this injury to go back for future medicals? Oh, absolutely, Your Honor. It's called Section 22 modification under the Act. And it's never foreclosed. Okay. He may have worked this area for 16 years. I'm kind of new at it, I guess. I've been doing this for a while. But it applies only to comp. Section 22 applies only to comp, cash money. There's no application to medical benefits under Section 7. Medical benefits are not within the meaning of compensation under Section 22 and therefore is never time barred. Seeler, S-I-L-E-R versus Dillingham, which relies on the Marshall v. Platts case, U.S. Supreme Court, 1943, which doesn't actually say it, but that's where you get the authority to do that. It's always open no matter what kind of case it is. My client 10 years from now winds up starting to go through neurological problems. They go in there and they find a CAT scan, and it shows that, by God, Dr. Lee was right. We should have done this originally. We've got an old herniated disc going in stenosis-wise. He gets the surgery. Nor, you know, it's employment-related. Also, claimant comes back. You talked about $11,900. That was paid a lot of months before he signed the settlement agreement. In 2001, the settlement agreement. I thought that was paid after. No, I was trying to show that, in fact, he was getting a lot of medical care. Judge Fletcher told me that I was wrong, and I accept that. Okay. We don't need to spend any more money. All right. And then I would like to say that he can be denied medical care under the Act. You know, if he does, if he has to advise the employer that he needs it, if he doesn't ask for authorization for treatment, you know, at their expense, but he can never be time-barred from imposing liability on the employer by showing that the reasonable necessity for the treatment is related to the employment. And that goes on for the rest of his life. And the only way you can lose it is yet on. Let me ask you, Alicia. Do you agree to that? No, Your Honor. You do? I don't. All right. Sit down. Okay. Here's what the BRB recognized that I got, and they were right. The right to modification under Section 22, which the time to 22 is expired. You know, I mean, I had to, for only the comp, though, not the meds. The right to medical benefits. They say it. It's true. That's the law. We're going to post-hearing brief this. His employment rights, which I'm really passionate about because I think that's why this case matters,  We can do something. Anyway. All right. And the credit issue, the $3,000. It changed hands. When that happened, I realized, hey, I won something. Now, why the judge didn't explain it in the order, I'm not sure. But the Benefits Review Board cannot go back and reconcoct it and say, oh, I said it was for future stuff as a credit. That's just not true. It's not in the order anyway. I was arguing for more temporary total. And we resolved that issue before we walked out in the trial. And that's why I'm not out there putting on witnesses and refuting it and this, that and the other thing. I can see I'm over. Okay. So have another drink of water. And let him back. And why don't you go out and settle this thing? Can't you do that? We're always ready. Come on, Jerry. You can do that. If you'd like that, just make one comment. It might be a drink. Thank you. Mr. Friedhelm, I think, and I'm not sure because I heard one thing and then I think he might have changed it, but he said he does have a remedy to open the door for future medical Section 22 modification. Section 22 modification only relates to compensation and indemnity payments. It does not relate to medical payments. And I have in the excerpt of records, page 87, addresses Judge Avery's order where he denied further medical care and treatment. Thank you. Okay. Now, do you go out and settle this case? I could always talk to my client. Clients. I got two of them. Where's your client? Right there. The lady there. The two pretty women in the courtroom. The two in the corner are your clients. Yes, sir. You got a pretty good job, haven't you? I do. So, get together with Terry, would you? Huh? Do it now. I'm getting old, you know. I want to get all these things out of the way before I have to go look for the benefits for you more than myself. So, we can try to settle it now. Your Honor, I will confer with my clients. Thank you. Okay. And let the clerk know, huh? I should? Yeah. Yes, Your Honor. Settle it before you leave. You've got about 15 minutes to do it. Otherwise, you see the guy looking through the window over there? Huh? You know who that is? I know him. You know him, huh? I know him. Okay. I don't know him too well. So, I gave him a high five. Okay. Thank you, Your Honor. Thank you. All right. Put a record. I don't have a record. Oh, I put the TV. All right. All right.
judges: B. Fletcher, Pregerson, Hall